Savings Institution of Harrodsburg *v.* E. Hutchison & Co.

**Pleading—Petition on Contract Between Banks.**

A petition on a contract, must show each specific item on which an alleged loss is claimed, and not a mere allegation in general as to a total loss.

**Same—Account Filed With the Pleadings.**

An account referred to in a petition and styled by "Exhibit ——" in which different items, constituting different transactions are set down, to constitute a part thereof, the items alleged to constitute the obligation must be shown in the petition, at least in subsance. And if a written contract, must be filed, or its loss accounted for.

**Same.**

So much of every contract or transaction must be stated in the pleadings as to show how the plaintiff is entitled to the relief he seeks.

APPEAL FROM MERCER CIRCUIT COURT.

September 14, 1870.

OPINION OF THE COURT BY JUDGE PETERS:

By an act of the legislature, approved March 7, 1850, entitled

"An act to incorporate the Elizabethtown Savings Institution, and for Other Purposes, Sess. Acts, 1849-50, pp. 617-624," The Harrodsburg Savings Institution was incorporated, and a majority of the persons named in the act as commissioners were to open books for the subscription of stock in said institution, and all the provisions of an act incorporating the Elizabethtown Institution were made applicable to the Harrodsburg Savings Institution, except that the shares of stock in the latter were to consist of twenty-five dollars each, instead of fifty, and were payable in installments of two dollars and fifty cents, when the subscriptions of stock were made, and two dollars and fifty cents monthly thereafter until the whole was paid in.

By the act of incorporation the capital stock was fixed at $50,000, with the power to increase it to $100,000, independent of the stock deposited. And after the smaller amount was subscribed, the stockholders were to proceed to the election, from amongst themselves, of five directors under the superintendence of at least three of the commissioners named to open books for subscriptions, and the directors were then to elect a president, and treasurer, and such other officers as they should deem necessary to conduct the affairs of the institution, and take bonds from them in sufficient penalties to secure the performance of their duties.

The business of the institution was to receive bank bills and other valuables on deposit, deal in gold, and silver coin, bullion, bills of exchange and promissory notes.

It does not appear from the pleadings, nor evidence, at what precise time it went into operation, but before the 3d of June, 1965, we may assume that the minimum amount of capital stock had been subscribed, and paid in, and the intsitution had been properly organized, and was transacting business, as on the last named day an act of the legislature was passed to authorize the president and directors to wind up and settle its affairs on equitable principles. Provided that the stockholders, representing a majority of the stock, consented thereto at a meeting of the stockholders in Harrodsburg, to be called by the president, directors, & Co., after twenty days notice shall have been given in the manner prescribed by the act. *2 Vol., Sess. Acts, 1865, p. 631.*

This action was brought by appellees, against said Institution, on the 11th of June, 1868, to recover from it the sum of forty-

nine thousand nine hundred and eighty-six 43-100 dollars, money advanced by appellees, as they allege, in paying off depositors of appellant, more than the property and effects of the latter transferred to the former amounted to, and for lossess sustained on the sales of real estate and interest, and the court below having rendered judgment against appellant for nearly the sum claimed, it has appealed to this court.

The cause of action as stated in the petition grows out of an alleged contract made on the 9th of April, 1867, by appellees, with appellant, to the following effect:

A. G. Kyle, R. M. Davis, and B. B. Campbell, making a board of directors of the Savings Institution, hereby offer the deposits of their institution, upon condition that the banking firm of E. Hutchison & Co. pay the depositors as fast as called for. The directors of the firm of E. Hutchison & Co. agree to become responsible for all the deposits, and in consideration thereof, the directors of the Savings Institution agree to give to the firm of E. Hutchison & Co. a lien on the land and property of the Savings Institution, and also bills enough so fast as they may be received to secure them; the firm of E. Hutchison & Co. agree to take the banking house vault, furniture and fixtures, etc., belonging to the Savings Institution, at the price of nine thousand dollars, which are to go towards paying the depositors, the cash on hand to be counted, and passed over to the firm of E. Hutchison & Co.; this writing entered on a book called a minute book, used by both institutions, appears to have been signed by A. G. Kyle, president of the Savings Institution, and attested by Cardwell the cashier.

On the 31st of July, 1867, as explanatory of the agreement just referred to, as is averred in the petition, a second writing was executed by E. Hutchison & Co. and the Savings Institution, which, after referring to the agreement of the 9th of April, 1867, recites, that E. Hutchison & Co. thereby agreed to pay off the depositors of the Savings Institution, whose claims were at the time estimated at ninety-two thousand dollars, from a statement furnished by J. W. Cardwell, then the cashier of said institution, in consideration that it would convey certain real estate, estimated at *thirty-nine thousand and seventy dollars,* and certain other property, and transfer bills as fast as they matured sufficient to secure E. Hutchison & Co. That the deposits in the Savings

Institution amounted $140,000, instead of $92,000, of which fact both parties to the first contract, at the time, were ignorant.

That E. Hutchison & Co. had paid for said Savings Institution eighty-three thousand one hundred and fifty-seven 74-100 dollars, and it had conveyed to E. Hutchison & Co. the lands in the original contract mentioned, the banking house and appurtenances, belonging thereto, at $9,000, and bills discounted amounting to $18,823.97, and cash $13,894.92, and concludes with the statement, that to prevent any misunderstanding, and to carry out the original contract between the parties, it was then agreed that E. Hutchison & Co. were not bound to pay the deposits with, and other liabilities of the Savings Institution, further than it furnished assets, with which to pay the same. This agreement was signed by A. G. Kyle, president, and Davis and Campbell, two of the directors of the Savings Institution, to bind the corporation, and not to impose a personal liability on the stockholders, as is stated at the close of the instrument, and the same, after their express approval, was signed by Hutchison & Co.

After reciting these alleged contracts, the original petition concludes as follows:

> "Plaintiffs state that the *defendant,* the Savings Institution of Harrodsburg, *is* indebted to them for money paid to the depositors of said Savings Institution, under and by reason of said contract, and for money paid for defendants in the sum of forty-nine thousand, nine hundred and eighty-six 43-100 dollars, after allowing all the credits to which the defendant is entitled, as will more fully appear by an account herewith filed, and made part hereof, marked 'Y.' No part of said sum has ever been paid. Wherefore, plaintiffs pray," etc.

Whether the allegations of the original petition, taking the contracts as recited therein, and the exhibit "Y" referred to, as parts thereof, authorized the judgment, is the first question we proceed to dispose of.

According to the statement in the contract of July, 1867, the indebtedness of appellant was estimated at $92,000, when, as the parties had subsequently ascertained, the deposits with appellant then amounted to $140.000, but appellees had then only paid out for appellant $83,157.74-100, and it had conveyed the land in the original contract mentioned, which was at $39,400. The banking

house and fixtures at $9,000, bills discounted $18,823.97-100 and cash on hand $13,894.92-100, aggregating the sum of $81,188.89-100, leaving a balance of payments, by appellees, over receipts, of $1,968.85-100, with the obligation of appellant that they should only pay its liabilities as it furnished the means for making payments. And there is no averment that appellees had paid or were bound to pay any more than said sum of $83,157.74-100, nor that appellant was bound to account for losses on the sales of real estate. It is manifest therefore that the judgment for the whole amount adjudged against appellant was not authorized by any averments in the original petition.

In an amended petition appellees allege that after making the contract of the 9th of April, 1867, relying upon the truth of the representations made by the ·defendant through its officers in regard to the amount of the deposits, and before the discovery of the falsehood of said representations, they rendered themselves liable to pay the depositors a much larger sum than the amount of assets furnished by defendant to pay the same, the excess being $49,986.43. That they credited defendant's depositors by the balance it owed them, on their books, and charged themselves on the pass-books of the several depositors with the amounts due to each. Whereby defendant's liability to them was fully discharged, and their responsibility fixed, and that they were made liable to said depositors, by the contract with appellant of the 9th of April, 1867, and from which they were not discharged by the one of the 31st of July, 1867, and could not be, without the concurrence of the said depositors. That their liability having been fixed by the first named contract, appellant executed the last contract to bind it for any excess over and above its assets that appellees should be required to pay, and they pray for judgment for said excess of $49,986.43, and pray alternatively to be substituted to the rights of the depositors, whom they have paid.

In the second petition appellees allege that appellant is indebted to them in the sum of $32,000 for money deposited by them with it—for money loaned, and for money paid out at its special instance and request. No part of which has been paid to them, although they had often demanded the same. They then repeat the charge of indebtedness of appellant as shown by the account filed of $49,986.43, and conclude with a prayer for a judgment for said sum.

As the sufficiency of the original petition, and amendments, to authorize the judgment rendered, is called in question, it was deemed proper to state the substance of them in this opinion, in order that the questions arising on them and their determination might be the better observed and understood.

Two contracts are stated in the petition as the foundation of the action; the one of the later date is referred to as explanatory of the first, and they are filed as parts of the petition. And account marked "Y" is also filed as a part of the petition as showing the items constituting the indebtedness of appellant to appellees.

Two items on that account and which constitute, in part, the alleged indebtedness, are charged as folows:

"To loss on Negly farm ......................$1934
To loss on Allen house ...................... 1600
                                             ————
                                              $3534"

Appellees pleadings contain no allegation that any contract ever existed between them and appellant in relation to the Negly farm and the Allen house, or either of them, and they wholly fail to allege any acts, or omissions, on the part of appellant in relation to said property, which entitled them to an action, or to any relief whatever, in connection with said property.

If the "Negly farm" and "Allen house" had been sold by appellant to appellees, and there was an agreement by which the latter was to refund to the former any loss they might sustain in the sale of them, and that agreement was reduced to writing, by section 145 Civ. Code, the writing should have been filed with the petition, or its absence accounted for, and even if the contract had been in writing, and it had been filed, it would have been necessary for appellees to have stated in their petition the contract in terms, or at least in substance, and then to have stated facts showing, either by the acts or omissions of appellant, they were entitled to an action, or to relief against it. And if such allegations and statements are necessary, where there is a written contract between the parties, and that filed, it is even more important that they should be made where there is not writing. *Hill* for use of *Wintersmith v. Barrett, &c., 14 B. M., 83; Collins v. Blackburn, Ib., 254; Riggs, &c. v. Maltby, &c., 2 Met., 88.*

In this case there is not an allegation in the pleading to be

found of an act, or an omission, for which appellant should be charged on account of the sale of the Negly farm and Allen house, and it was erroneous to render judgment for any loss on said farm and house.

It may be further observed, that there are other items in appellees' account which should not have been allowed without specific and direct statements of facts in the petition sufficient to constitute a contract, express or implied, and upon which an indebtedness must be shown. For example, the first charge on the account of appellees is as follows: "1867, April 20. To cash paid in by stockholders *E H. & Co.* and placed to *Cr. E. H. & Co* on Savings *B. K. Books* as deposit $29,250.00." Admitting that courts may understand the artistic mode of keeping accounts, by *Capitals* or initials, or even in hieroglyphics, still it is not readily perceived how appellant under the contracts set out in the petition can be made responsible upon a mere entry of that character without a statement of facts to show how its liability arose. If *E. H. & Co.* means E. Hutchison & Co., then it appears that some of the persons who composed the firm of E. Hutchison & Co. were stockholders in the *Savings Institution,* and it may be that the money paid in by the members of said firm was the money due from them on their stock in said Savings Institution. If, again, *Savings "B. K. Books"* means the books of the Savings Institution, which may be inferred, but which is scarcely allowable, as we have failed to observe in any other part of the record that appellant was ever styled *"Savings B. K."* Other items might be referred to on the account, which are not embraced in the scope and meaning of the contracts set out as the foundation of the action, and which were allowed in making out the indebtedness of appellant, without sufficient allegation, but a particular reference to all of them would extend this opinion to an unreasonable length—now already too long. And we therefore close this branch of the case with the remark, that so much of every contract or transaction should be stated in the pleadings as to show how appellees are entitled to the relief they seek.

The alleged contracts made by appellant with appellees are not the mode contemplated by the act *supra* for settling and winding up the affairs of appellant, but as the stockholders representing a majority of stock in the institution seem to have entered into, and approved, said contracts, and as irreparable

injury might result from setting aside said contracts, it seems to be to the benefit of all parties interested that the accounts between the parties should be now settled and closed up according to the spirit and meaning of said contracts, and on equitable principles.

Wherefore, the judgment is reversed, for the reasons herein stated, and the cause is remanded, with directions that appellees have permission to amend their petition, and for further proceedings consistent herewith.

*Klye, James, Durham & Jacobs, for appellant.*

*Hardin, for appellees.*